145 P.3d 821

STATE of Hawai'i, Plaintiff–Appellee,

v.

Guy K. MEYERS, Defendant–Appellant,

and

Manuel Kupahu, aka Manuel Kupahu, Jr.;
Robert Kuhio Kupahu; Gavin A.H. Ka-
lai, aka Hano Kalai, Defendants

and

State of Hawai'i, Plaintiff–Appellee,

v.

Robert Kuhio Kupahu, Defendant–
Appellant

and

Manuel Kupahu, aka Manuel Kupahu,
Jr., Guy K. Meyers, and Gavin A.H.
Kalai, aka Hano Kalai, Defendants

and

State of Hawai'i, Plaintiff–Appellee,

v.

Manuel Kupahu, aka Manuel Kupahu,
Jr., Defendant–Appellant,

and

Robert Kuhio Kupahu, Gavin A.H. Kalai,
aka Hano Kalai, and Guy K. Meyers,
Defendants.

Nos. 26574, 26580, 26586.

Intermediate Court of Appeals of Hawai'i.

Aug. 17, 2006.

Certiorari Dismissed Sept. 19, 2006.

Certiorari Denied Feb. 1, 2007.

**280**

Michael J. Park, on the briefs, for Defendant–Appellant, Guy K. Meyers.

Mark Yuen, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

1. By previous order, this court consolidated Appeal Numbers 26574, 26580, and 26586.

2. The Honorable Gerald H. Kibe presided.

3. Hawaii Revised Statutes (HRS) § 707–710 (1993) provides in pertinent part:

    (1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.

4. HRS § 705–500 (1993) provides in pertinent part:

Cynthia A. Kagiwada, on the briefs, for Defendant–Appellant, Robert Kuhio Kupahu.

Stephen K. Tsushima, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

Jeffrey A. Hawk (Hawk, Sing & Ignacio), on the briefs, for Defendant–Appellant, Manuel Kupahu, aka Manuel Kupahu, Jr.

BURNS, C.J., FOLEY, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

In these consolidated appeals,[1] Defendants–Appellants Manuel Kupahu, also known as Manuel Kupahu, Jr. (Manuel), Robert Kuhio Kupahu (Robert), and Guy K. Meyers (Meyers) appeal from their respective Judgments filed on May 12, 2004, in the Circuit Court of the First Circuit (circuit court).[2] Manuel is Robert's father and Meyers's neighbor. Manuel, Robert, and Meyers, along with Gavin A.H. Kalai (Kalai), were indicted and charged in Count 1 with Assault in the First Degree (Assault 1) and in Count 2 with Assault in the Second Degree (Assault 2). Manuel was charged alone in Count 3 with Cruelty to Animals.

The circuit court granted the motion of the State of Hawai'i (the State) to *nolle prosequi* Count 2, without prejudice. Kalai pleaded no contest to the Assault 1 charge, and Manuel, Robert, and Meyers proceeded to trial. The jury found Manuel and Robert guilty as charged of Assault 1, in violation of Hawaii Revised Statutes (HRS) § 707–710 (1993),[3] and Meyers guilty of the included offense of Attempted Assault 1, in violation of HRS § 705–500 (1993).[4] The jury also found Manu-

    (1) A person is guilty of an attempt to commit a crime if the person:

    . . . .

    (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

    (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a

el guilty as charged of Cruelty to Animals, in violation of HRS § 711–1109(1)(a) (Supp. 2005).[5] Manuel was sentenced to five years' probation on his Assault 1 conviction, subject to a special condition that he serve a one-year term of imprisonment, and to six months' imprisonment on his Cruelty to Animals conviction, with the terms of imprisonment to be served concurrently.[6] Robert was sentenced to ten years' imprisonment to be served concurrently with the sentence imposed in a federal case. Meyers was sentenced to ten years' imprisonment and Kalai was sentenced to five years' probation to be served concurrently with Kalai's sentence in another state case.

On appeal, Manuel, Robert, and Meyers (collectively referred to as "the Defendants") argue that: 1) the circuit court erred in denying their motions for judgment of acquittal on the Assault 1 charge; and 2) the circuit court committed plain error in permitting a doctor to testify about potential complications arising from the injuries suffered by the complaining witness (CW). In addition, Robert argues that his trial counsel provided ineffective assistance in failing to object to the doctor's testimony about the potential complications arising from the CW's injuries. Meyers separately argues that: 1) there was insufficient evidence to support his Attempted Assault 1 conviction; and 2) the circuit court erred in instructing the jury on the included offense of Attempted Assault 1. We affirm the Judgment as to each of the Defendants.[7]

## BACKGROUND

### I. The State's Case

The charges against the Defendants arise out of events occurring at Waimanalo Beach Park on March 30, 2003. A college professor named Eric was walking his dog on the beach. A small mixed pit bull dog approached Eric's dog, sat down, and started wagging its tail. From a distance of about 30 yards, Manuel screamed for the pit bull to come. The pit bull obeyed and went to Manuel. Eric testified that Manuel seemed angry. Manuel yelled at the pit bull and, holding the dog by its rope collar, hit the dog in the face. Manuel then walked knee-deep into the water, held the pit bull under water, brought it out of the water, and hit it again. Manuel returned to the beach where he picked the pit bull up by its hind legs and swung the dog over his head. The pit bull landed head first on the sand and went limp. It appeared to Eric that the dog's neck had been broken. Eric looked on in shock. He heard others on the beach saying that the police should be called immediately.

The CW and his wife were at Waimanalo Beach Park to watch their son and daughter participate in an outrigger canoe race. The CW, who was 51 at the time of the trial, testified that he saw Manuel in knee-deep water "savagely beating and choking and drowning his dog." The CW saw Manuel raise the dog in the air by its collar, punch the dog in the face, then shove the dog's head underwater and hold it there for a long period of time. Manuel engaged in this conduct repeatedly. The CW heard people say "my God, somebody do something." The CW tried to call 911 on his cellular phone but was unable to maintain a connection. The CW approached Manuel and asked Manuel to please stop hurting the dog and to leave it alone. Manuel responded that the dog was his and that he could do whatever he wanted

substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

5. HRS § 711–1109(1)(a) (Supp.2005) provides:

(1) A person commits the offense of cruelty to animals if the person intentionally, knowingly, or recklessly:
(a) Overdrives, overloads, tortures, torments, cruelly beats or starves any animal, or causes or procures the overdriving, overloading, torture, torment, cruel beating or starving of any animal, or deprives a pet animal of necessary sustenance or causes such deprivation[.]

6. The Circuit Court of the First Circuit (circuit court) stayed the sentence of Defendant–Appellant Manuel Kupahu (Manuel) pending appeal.

7. Manuel did not challenge his conviction and sentence on the Cruelty to Animals charge on appeal. We therefore affirm his Judgment as to that charge without further discussion.

to it. Manuel also told the CW, "[G]et the fuck out of ... here, you Goddamn haole,[8] get off my fucking beach."

The CW told Manuel that the CW would take care of the dog if Manuel did not want it. Manuel dragged the limp dog toward the CW, got up in the CW's face, swore at the CW, and then shoved the CW twice. The CW grabbed Manuel and they wrestled to the ground. The CW was attempting to restrain Manuel so that the dog could get away. The CW stopped wrestling with Manuel when the CW heard his wife say, "[O]h my God, the dog is dead." The CW got off Manuel and walked with his wife to the lifeguard stand. Manuel stood up and went in a different direction, dragging the limp body of the dog behind him. The lifeguard advised the CW that he better leave the area, and the CW and his wife headed toward their car in the parking lot.

Around that time, a woman named Shannon saw a group of men that included Robert running on the beach toward her. Shannon heard Robert yell, "Where is that fucking haole, I'm going to kill him" and "[A] fucking haole is going to die on this beach today." Shannon, who was visibly pregnant at the time, told Robert to leave the CW alone. Robert replied, "[F]uck you, cunt." Robert took a few steps toward Shannon but then continued on when someone in his group said to "leave her alone."

As the CW and his wife were approaching their car, the CW saw Manuel, Robert, Meyers, and another man coming toward the CW. Manuel pointed to the CW and told the other men to "get him." The CW testified that Meyers, who was ahead of the others, prevented the CW and his wife from getting into their car. Meyers ran in front of the CW and started swinging at the CW's face. The CW told Meyers that the CW did not want any trouble and used his hands to block Meyers's punches. Fearful that the men in Manuel's group would attack his wife, the CW tried to draw them away from his wife by running back toward the beach. Someone, whom the CW thought was Meyers, tackled the CW from behind. The CW curled up into a defensive "ball" position on the ground because he was overwhelmed by people punching and kicking him.

The CW testified that Robert punched him and, using a running start, kicked him in the left ribs and abdomen. Manuel kicked the CW on the left side and choked the CW. The CW believed that Meyers participated in the beating but could not be certain. A fourth man kicked the CW from the right side. The beating lasted for at least several minutes. While the CW was being beaten, his wife pleaded with the four men, saying "[W]e're sorry, please leave my husband alone, please let him go." Manuel looked at the CW's wife and told her, "[S]hut up, bitch, you're next." When the attack finally ended, Manuel looked down at the CW and told him, "[B]rah, remember this face."

Eric witnessed the attack on the CW. Eric testified that he saw four men punching, kicking, and stomping on the CW. Eric saw Robert, whom Eric described as "extremely muscular," standing over the CW in a widespread stance, looking for the opportunity to punch the CW. If the CW covered his face, Robert would punch the CW in the ribs. If the CW covered his ribs, Robert would punch the CW in the face or head. Eric saw Manuel, Meyers, and another man kicking and stomping on the CW in the chest and head. The CW did not fight back. The four men were angry and were out to beat the CW badly. When they finished beating the CW, the four men "swaggered away." Eric testified that he was "very certain" that Robert, Manuel, and Meyers each participated in the attack on the CW. Several other witnesses called by the State, however, were unable to identify Meyers as one of the men attacking the CW while the CW was on the ground.

After the attack was over, Eric helped the CW who was laying prone on the ground and was bleeding badly from the face. The CW's wife drove the CW to the Castle Hospital emergency room where he was treated by Dr. Vincent Ritson (Dr. Ritson). The CW was struggling to breathe and was concerned that he had internal injuries. The CW had

8. "Haole" is a Hawaiian word for white person or Caucasian. *See* Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 58 (rev. ed.1986).

pain in both sides of his ribs and cuts above his eyes. After leaving the hospital, the CW had severe pain and discomfort, making it difficult for him to breathe. In response to questioning by the Deputy Prosecuting Attorney (DPA), the CW testified as follows:

Q. And with respect to your ribs, can you tell the jury what, if anything, were the effects of the area to your ribs after you left the hospital?

A. After I left the hospital?

Q. Yes.

A. Just real bad pain and discomfort.

Q. Did you have further trouble breathing?

A. By the time I got home, I could breathe, I had to breathe very shallowly. I didn't want my kids making me laugh because it made me hurt, but.

Q. How long did this continue?

A. How long did the pain continue?

Q. Yes.

A. I would say about two weeks. I mean, there was pain after that, too, but the pain began to alleviate.

Q. Now, did this pain cause you to have to continue to breathe in a shallow fashion?

A. Yes.

Q. What would happen if you breathed more deeply?

A. It really would hurt. I couldn't.

Dr. Ritson, an emergency medicine physician, testified that he examined the CW on March 30, 2003. Dr. Ritson observed that the CW had facial lacerations and bruises, apparent choke marks on his neck, and significant pain in his rib area. The most serious injuries appeared to be in area of the CW's ribs and lung, and Dr. Ritson saw early bruising in that area. Dr. Ritson stated that an x-ray and a CAT scan of the CW's chest revealed that the CW had eight fractured ribs, five on the left side and three on the right side. The DPA then questioned Dr. Ritson as follows:

Q: Now, Doctor, in making your—or ordering these diagnostic tests, the CAT scan as well as the X rays, were you looking for anything beyond, perhaps, injuries to the rib area?

A: Yes, with multiple ribs, there's a fear of a collapsed lung or damage to the vessels that run along the ribs and significant bleeding. There's also a potential for damage to the heart and the great vessels that run down an aorta and things like the esophagus and trachea with that degree of damage.

Q: Now, specifically, with respect to the injuries that [the CW] had, were they to one area of the rib cage or multiple areas of the rib cage? And I'm referring to this—I understand it's bilateral, both sides of his rib cage. But were they all upper? Were they lower? Where were these injuries?

A: The right side, I believe, were the 9th, 10th, and 11th ribs, which are lower ribs. The 12th is the very bottom rib. So it was the lower ribs on the right side, and the left side was mixed, lower and mid ribs.

Q: Now, with respect to the lower rib area, are there any concerns that you have with respect to injuries to the lower portion of the rib cage?

A: Lower ribs, basically, shield vital organs in the abdomen such as the kidneys, the liver, the spleen, the intestines, the stomach. So with lower rib injuries, not only are we concerned about lung but also potential abdominal injuries, kidney injuries, spleen injuries.

Q: Now, once—did you, in overall evaluation, determine whether or not any of the internal organs within the rib cage were, in any way, damaged?

A: The CAT scan did not show any significant injury other than to the ribs themselves. There was no collapsed lung that showed up or no significant bleeding inside the chest that was found.

Q: Now, Doctor, once you made that determination that what we had, essentially, was five fractured ribs to the left side and three fractured ribs to the right side, what did you, then, do?

A: Um, I'm not sure if I had done any other lab testing. I don't have the chart with me. I have a feeling I, probably, at that stage also did a urinalysis and also

took care of the lacerations on his face. He had two lacerations on his face that required suturing.

Q: And these lacerations on his face, do you recall, approximately, the length of these lacerations?

A: I believe they were both, approximately, an inch in length.

Q: Would they constitute a major laceration in your estimation?

A: They constitute a major laceration in the sense that they are very cosmetic on the face and required suturing. If they hadn't been sutured, they, probably would result in significant scaring [sic] and deformity.

Q: Now, Doctor, with respect to the rib injuries, did they cause any protracted loss or impairment of the function of any bodily member or organ?

A: You would expect that they should because they're vital to help protect the lungs. So every time the person with that many fractured ribs breathes, they're going to have significant pain. Each breath, then, will be shorter. The person then is at risk for developing pneumonia from not taking big breaths and not being able to cough well because of the severe pain. The pain from ribs can take anywhere from four to six weeks initially to heal, and a lot of people have residual pain for months after that from even single fractured rigs [sic] much less multiple ribs. There's also a risk, with the rib fractures, that they could puncture the lung at any time or lacerate the vessels that run underneath the ribs, putting the person at risk for collapsed lung or significant bleeding into the lung.

Q: Now, Doctor, with respect to rib injuries, once you make a diagnosis of a rib injury, what treatment process is there for rib injuries?

A: The basic treatment of rib injuries is allowing time to allow it to heal. The older system of treatment used to be to bind the ribs, but they found that that causes pneumonia because the patient can't take a deep breath. Unless there is a major flail segment where the ribs are free moving and the lung is totally non-

functional, the basic treatment is just time to let the ribs heal and treating the pain that the person has and making sure that they don't develop complications such as the pneumonia, collapsed lung, or the bleeding.

Q: Now, the collapsed lung, how does that occur?

A: Basically, the rib edges, if they're broken, are sharp. The lung itself is a fairly delicate material. So if the delicate material on expansion hits the sharp rib, it's like a balloon hitting a needle. It can pop and then collapse.

Q: And, Doctor, what is the risk if the person's lung is punctured?

A: If the lung is punctured, several things can happen. The lung itself can collapse down, pressure can continue to build up in the space between the lung and the rib cavity and cause the other lung to collapse, the person can die. The lung itself can collapse down, stabilize with just a large collapsed lung and very inefficient air exchange with the person having a lot of problems just getting basic breaths. Or with a small collapse, the lung may, eventually, just heal and re-expand on its own.

Q: So, Doctor, to a reasonable degree of medical certainty, would you—would it be your opinion that—I'm sorry—would it be your diagnosis and your conclusion that the injury to the eight ribs, the eight rib fractures to [the CW] did cause a protracted loss or impairment of the function of a bodily member or organ?

A: Yes.

Q: Now, with respect to [the CW], did you follow the normal course of treatment with him, essentially, not binding his rib cage?

A: That is correct.

Q: Aside from that, was there any other intervention that you could do or you did with respect to [the CW]?

A: I believe we gave him pain medication and the suturing of his facial lacerations.

Q: In the context of his leaving your care at the hospital, was [the CW] still at risk for the various things that you've tes-

tified to regarding potential injuries or further injury from rib injuries?

A: Yes, he was.

Q: And was there anything that you medically could have done at that point or reasonably medically could have done, with respect to [the CW], to reduce those risks?

A: Basically, reducing his activity, not putting him at risk for stressing the ribs. In other words, his activities would be severely limited. We wouldn't have him doing basic functions such as paddling, jogging, running, sports, or anything for the period so that the movement of the ribs is less and less likely to cause problems.

Q: With respect to his breathing, would that be, in any way, affected by the fact that you, basically, can't do very much or you didn't do very much to assist in the healing process?

A: Definitely. Each breath, I'm sure, is extremely painful. If you've had broken ribs, it's extremely painful every time you breath [sic], cough sneeze. Movements are extremely painful. So basic functions of living are, certainly, affected by that.

Q: And if you're [sic] breathing is affected, does that present additional complications?

A: Yes. Once again, it puts you at risk for not expanding the lungs, as well, having mucous pool, and developing pneumonia. With pneumonia, further infection and, possibly, death. So pneumonia's a real possibility with single rib fractures and markedly increase with multiple rib fractures.

The Defendants did not object to any of Dr. Ritson's testimony.

Manuel's counsel, through his cross-examination of Dr. Ritson, established that Dr. Ritson did not examine the CW after the CW's emergency room visit on March 30, 2003. Thus, while Dr. Ritson expected that the CW would experience significant pain from his broken ribs for at least four to six weeks,[9] Dr. Ritson did not know how long the CW actually experienced significant pain. Dr. Ritson also acknowledged that he did not know if the CW subsequently developed pneumonia or a collapsed lung. Dr. Ritson stated that the risk of developing pneumonia was probably only 20 to 25 percent for someone in the CW's position and that the risk of a collapsed lung did not prevent it from being safe to send the CW home. Dr. Ritson conceded that, unless ribs were considered internal organs, there was no damage to the CW's internal organs, that he had prepared a report finding that the CW's injuries did not create a substantial risk of death, and that the CW did not suffer any serious permanent disfigurement.

On cross-examination by Manuel's counsel, the CW acknowledged that after being treated at the hospital by Dr. Ritson, he was released the same day. The CW further acknowledged that after the incident, he did not develop pneumonia, suffer a punctured lung, or suffer a puncturing of any other organ. The CW stated that following the incident, his condition improved.

At the close of the State's case in chief, the Defendants moved for judgment of acquittal on the Assault 1 charge. The circuit court denied the Defendants' motions.

## II. The Defense Case

Manuel testified that he was 53 years old and lived across from Waimanalo Beach Park. Manuel stated that he trained dogs, including pit bulls, to hunt wild boars. Manuel testified that a dog's failure to listen to his commands could "ruin the whole pack" so he disciplined his dogs if they disobeyed him. On March 30, 2003, Manuel took two dogs to Waimanalo Beach Park, including a nine-month-old pit bull that Manuel had been training for two weeks. This young pit bull chased and played with a small dog belonging to people on the beach, ignoring Manuel's commands. When Manuel caught up to the

9. On cross-examination, Dr. Vincent Ritson (Dr. Ritson) testified as follows:

Q. You also testified that this person, [the CW], had some broken ribs?

A. That is correct.

Q. And it's your opinion that he would have significant pain for four to six weeks afterwards?

A. Most patients would have at least that much pain; some would have it much longer.

young pit bull, he grabbed its collar and hit the dog in the chest.

According to Manuel, he then held the dog under water "[t]o cool 'em off," and hit the dog two or three more times. A haole man told Manuel not to hit the dog and Manuel told the man to "mind [your] own business." Manuel testified that the haole man hit Manuel from behind, then stuffed Manuel's face in the sand, causing him to "black out." According to Manuel, he eventually regained consciousness but was "still in a daze." Manuel told a friend to "[g]o call my son." Manuel walked home, dragging and carrying the young pit bull, and put the dog in the driveway. The dog was dead. While at home, Manuel talked to Meyers, Manuel's neighbor, and told Meyers that the haole guy had stuffed Manuel's face in the sand.

Manuel testified that he later walked back to Waimanalo Beach Park. He saw Meyers approach the haole guy, and the two men began exchanging punches, with none landing. Manuel stated that Kalai later restrained the haole man and that Robert punched the haole man in the face. Manuel testified that he saw three or four other men kicking the haole man, but did not know who these other men were. Manuel denied punching or kicking the haole man.

Robert Martin (Martin), who grew up with Meyers, testified that on March 30, 2003, he saw Meyers confront the CW in the parking lot. Martin stated that Meyers and the CW swung at each other but both missed. Martin testified that when the CW ran away, Meyers did not follow the CW but walked with Martin toward Meyers's house.

At the close of the evidence, the Defendants renewed their motions for judgment of acquittal. The court denied the Defendants' motions.

**10.** Defendants–Appellants Manuel Kupahu (Manuel), Robert Kuhio Kupahu (Robert), and Guy K. Meyers (Meyers) (collectively referred to as "the Defendants") made motions for judgment of acquittal at the close of the prosecution's case in chief and at the close of the evidence. Manuel and Meyers waived their right to challenge the trial court's denial of their motions made at the

## DISCUSSION

### I.

The Defendants claim that the circuit court erred in denying their motions for judgment of acquittal on the Assault 1 charge. When reviewing a trial court's ruling on a motion for judgment of acquittal, we use

> the same standard that a trial court applies to such motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weight [sic] the evidence, and draw justifiable inferences of fact.

*State v. Poohina,* 97 Hawai'i 505, 508–09, 40 P.3d 907, 910–11 (2002) ("[sic]" in original).[10]

The Defendants were charged with Assault 1, which prohibits a person from "intentionally or knowingly caus[ing] serious bodily injury to another person." HRS § 707–710(1). The phrase "serious bodily injury" is defined to mean "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or *protracted loss or impairment of the function of any bodily member or organ.*" HRS § 707–700 (1993 & Supp.2005) (emphasis added). The parties agree that the portion of the "serious bodily injury" definition at

close the prosecution's case in chief by presenting evidence in their defense. *State v. Pudiquet,* 82 Hawai'i 419, 423, 922 P.2d 1032, 1036 (App. 1996). For purposes of our analysis in this appeal, it makes no difference whether we view the evidence at the close of the prosecution's case in chief or at the close of all the evidence.

issue in this case is whether the CW suffered a "protracted ... impairment of the function of any bodily ... organ."

The Defendants argue that there was insufficient evidence to show that the CW suffered a protracted impairment of the function of any bodily organ. They contend that the CW's injuries only constituted "substantial bodily injury" sufficient to establish Assault 2,[11] but not "serious bodily injury" required for Assault 1. The State counters that there was sufficient evidence to prove that the CW suffered a protracted impairment of the function of his lungs in that the CW's fractured ribs impaired his ability to breathe for a prolonged and extended period of time. We agree with the State and hold that the circuit court properly denied the Defendants' motions for judgment of acquittal.

We conclude that there was substantial and convincing evidence that the CW suffered "serious bodily injury." The evidence showed that the CW suffered eight fractured ribs, three on the right side and five on the left. The CW testified that he experienced severe pain and discomfort after the assault, requiring him to breathe very shallowly. He indicated that although the pain began to alleviate after two weeks, the pain persisted beyond the two-week period. The CW testified that this pain caused him to continue to breathe in a shallow fashion because it "really would hurt" if he breathed more deeply.

Dr. Ritson testified that in his opinion, the CW's eight fractured ribs caused a protracted loss or impairment of the function of a bodily member or organ, namely, the lungs. Dr. Ritson stated that a person with that many fractured ribs would suffer significant pain every time he or she breathed, impairing the person's ability to breathe by making each breath shorter. Dr. Ritson indicated

that pain from fractured ribs would persist for at least four to six weeks, which is how long it took for ribs to initially heal. He further noted that many people with only one fractured rib experienced residual pain for months after this four-to-six-week period, whereas the CW had eight fractured ribs. Dr. Ritson testified that broken ribs affect the basic functions of living because they make it extremely painful not only to breathe, but to move, cough, or sneeze.

The evidence showed that the CW's eight fractured ribs resulted in a protracted impairment of the function of his lungs and, accordingly, that the CW suffered serious bodily injury. *See State v. Hilpipre*, 395 N.W.2d 899, 903–04 (Iowa Ct.App.1986) (upholding trial court's finding that the victim has suffered a "protracted loss or impairment of the function of a bodily member or organ" based on injuries which included pain from two broken ribs that impaired the functioning of the victim's lungs over a several-month period); *Walker v. State*, 742 P.2d 790, 791 (Alaska Ct.App.1987) (holding that evidence that the victim suffered a broken jaw which had to be wired shut for six weeks was sufficient to prove that the victim suffered a "protracted impairment of the function of a body member or organ").[12] We reject the Defendants' claim that the CW's testimony established that the impairment in the CW's ability to breathe ended after two weeks. When viewed in context, the CW's testimony simply indicated that the *extreme* pain he experienced from his eight fractured ribs began to subside two weeks after the assault. Reasonably construed, the CW's testimony did not mean that the pain ended or that his breathing was no longer impaired after two weeks. In any event, based on Dr. Ritson's testimony, the jury could reasonably

---

**11.** Under HRS § 707–711(1)(a) (1993), a person commits the offense of Assault in the Second Degree if "[t]he person intentionally or knowingly causes substantial bodily injury to another[.]" HRS § 707–700 (1993 & Supp.2005) defines "substantial bodily injury" to mean

bodily injury which causes:
(1) A major avulsion, laceration, or penetration of the skin;
(2) A burn of at least second degree severity;
(3) A bone fracture;
(4) A serious concussion; or

(5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

**12.** In *State v. Yamashiro*, 8 Haw.App. 595, 601–02, 817 P.2d 123, 127 (1991), this court cited *Walker v. State*, 742 P.2d 790 (Alaska Ct.App. 1987), as support for its conclusion that the evidence was sufficient to prove that the assault victim suffered "serious bodily injury" under HRS § 707–700.

infer that the CW experienced pain and impaired breathing for at least four to six weeks and up to several months.

Meyers separately argues that there was insufficient evidence of serious bodily injury to support his conviction for Attempted Assault 1. Our conclusion that the circuit court properly denied the Defendants' motions for judgment of acquittal on the Assault 1 charge disposes of Meyers's argument. While Assault 1 requires proof that the defendant actually caused serious bodily injury, Attempted Assault 1 only requires proof that the defendant *intended* to cause serious bodily injury. *See* HRS §§ 705–500(2), 707–710(1).

## II.

Without objection from the Defendants, Dr. Ritson testified that the CW's broken ribs exposed the CW to the risk of complications such as developing pneumonia or suffering a collapsed lung. The evidence showed that the CW ultimately did not experience these potential complications. The CW testified that he did not develop pneumonia or suffer a punctured lung and that his condition improved following the incident.

The Defendants argue that the circuit court committed plain error in permitting Dr. Ritson to testify about the potential medical complications that could have arisen from the CW's broken ribs. They contend that because Assault 1 requires proof that the CW actually suffered serious bodily injury, Dr. Ritson's testimony about complications the CW could have suffered was irrelevant. In support of their argument, the Defendants rely on *State v. Malufau,* 80 Hawai'i 126, 906 P.2d 612 (hereinafter *"Malufau I"*), *opinion amended on reconsideration,* 80 Hawai'i 126, 134, 906 P.2d 612, 620 (1995) (hereinafter *"Malufau II"*).[13]

The defendant Malufau was charged with and found guilty at trial of Assault 1. *Malufau I,* 80 Hawai'i at 128, 906 P.2d at 614. The prosecution's theory was that a scar on the victim's forehead from a two-inch gash

constituted a "serious, permanent disfigurement" and thus "serious bodily injury" under HRS § 707–700. Over a relevancy objection from the defense, Dr. Walczak was permitted to testify that without treatment, the victim would have likely suffered serious permanent disfigurement because the wound would probably have become infected, resulting in a larger scar than usual. *Id.* The Hawai'i Supreme Court held that the doctor's testimony regarding "what the severity of the injury would have been absent medical attention" was irrelevant because Assault 1 requires proof of the injury that actually resulted from the defendant's conduct. *Id.* at 130, 906 P.2d at 616.

The supreme court, however, made clear that its conclusion that the doctor's testimony was irrelevant was based on the rather unique circumstances of Malufau's prosecution. The court noted that expert medical testimony on "what the severity of the [victim's] injuries would have been absent medical attention" is relevant where the prosecution seeks to prove that the injury created a substantial risk of death. *Id.* at 130 n. 6, 906 P.2d at 616 n. 6. More pertinent to this case, the court further recognized that such medical testimony could be relevant where the jury was instructed on the included offense of Attempted Assault 1:

> [W]e recognize that expert medical testimony regarding what the severity of a person's injuries would have been absent medical attention could be relevant to prove that a defendant committed the offense of attempted assault in the first degree by "intentionally engaging in conduct which was a substantial step in a course of conduct intended or known to cause" serious bodily injury. *See* HRS §§ 705–500(2) (1993), 707–710(1). We further note that when such evidence is admitted to prove that a defendant committed the offense of attempted assault in the first degree, the defendant will be entitled to a limiting instruction, *see* [Hawaii Rules of Evidence (HRE)] Rule 105 [1993], to ensure that

---

**13.** To avoid confusion, we will refer to the Hawai'i Supreme Court's original opinion in *State v. Malufau,* 80 Hawai'i 126, 906 P.2d 612 (1995) as *"Malufau I"* and the portion of the opinion that

was amended on reconsideration, which begins at 80 Hawai'i at 134, 906 P.2d at 620, as *"Malufau II."*

the jury understands that the evidence cannot be used to establish that "serious, permanent disfigurement" actually occurred. *In the instant case, however, because the jury was not instructed on the included offense of attempted assault in the first degree, Dr. Walczak's testimony was not relevant to any issue before the jury.*

*Id.* (emphasis added) (brackets in original omitted). Later in *Malufau I*, the court stated that Dr. Walczak's testimony on what would have happened if the victim's wounds had not been treated would have been relevant to whether Malufau was guilty of Attempted Assault 1.[14] *Id.* at 134 n. 12, 906 P.2d at 620 n. 12.

The Defendants' reliance of *Malufau I* is clearly misplaced. *Malufau I* holds that a doctor's testimony on complications the victim could have suffered is irrelevant *only when the jury is not instructed on the included offense of Attempted Assault 1. Malufau I,* 80 Hawai'i at 130 n. 6, 906 P.2d at 616 n. 6. Indeed, *Malufau I* supports the proposition that when the jury is instructed on the included offense of Attempted Assault 1, as was done in the Defendants' case, a doctor's testimony regarding potential complications from the victim's injuries is relevant and admissible. This is because evidence regarding the injures that could have resulted from a defendant's conduct is relevant to whether the defendant intentionally engaged in conduct which was a substantial step in a course of conduct intended to cause serious bodily injury. *Id.* at 130 n. 6, 134, 906 P.2d at 616 n. 6, 620; *see* HRS §§ 705–500(2), 707–710(1). Here, the evidence showed that the

Defendants brutally beat the CW, breaking eight of the CW's ribs. Evidence regarding the typical complications that could have resulted from the CW's broken ribs was relevant to whether the Defendants intended to cause serious bodily injury. We conclude that Dr. Ritson's testimony regarding the complications the CW could have suffered from his fractured ribs was relevant to prove the included offense of Attempted Assault 1. *Id.* at 134 n. 12, 906 P.2d at 620 n. 12. We therefore reject the Defendants' argument that such testimony by Dr. Ritson was irrelevant and their claim that the circuit court committed plain error in admitting Dr. Ritson's testimony.

■ We note that the court in *Malufau I* stated that the defendant "will be entitled" to a limiting instruction where evidence of the complications the victim could have suffered is introduced. *Id.* at 130 n. 6, 906 P.2d at 616 n. 6. The purpose of the limiting instruction would be to advise the jury that such evidence can only be considered to establish whether the defendant committed Attempted Assault 1 and not whether the defendant committed Assault 1. *Id.* None of the Defendants requested a limiting instruction at trial. Moreover, none of the Defendants raised the circuit court's failure to give a limiting instruction as an issue on appeal. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) ("Points not argued may be deemed waived.").

In any event, we conclude that the circuit court's failure to give a limiting instruction *sua sponte* does not entitle the Defendants to

---

**14.** The Hawai'i Supreme Court's statement was made in the context of its discussion on whether there was sufficient evidence at trial to prove Attempted Assault in the First Degree (Attempted Assault 1) such that the court could remand the case for retrial on that included offense even though there was insufficient evidence on the charged offense of Assault in the First Degree (Assault 1). *Malufau I,* 80 Hawai'i at 134, 906 P.2d at 620. In *Malufau I,* the court held that sufficient evidence had been produced to prove the included offense of Attempted Assault 1 and thus remanded for a retrial on that offense. *Id.* at 134, 906 P.2d at 620. In *Malufau II,* the court amended its *Malufau I* opinion and held that retrial on the offense of Attempted Assault 1 would not be permitted. *Malufau II,* 80 Hawai'i

at 138, 906 P.2d at 624. The court reasoned in *Malufau II* that although Attempted Assault 1 was an included offense of Assault 1, it was not a *lesser* included offense because Attempted Assault 1 and Assault 1 were offenses of the same class and grade. *Id.* Thus, the court concluded that "it would be inequitable and contrary to the purposes of the double jeopardy clause" to allow a defendant to be retried on Attempted Assault 1 when the defendant's conviction for Assault 1 had been reversed for insufficiency of evidence on appeal. *Id.* The court's analysis in *Malufau II* did not cast doubt on its statement in *Malufau I* that Dr. Walczak's testimony would have been relevant to whether the defendant was guilty of Attempted Assault 1.

any relief under the plain error standard of review. Appellate courts are authorized under the plain error standard of review "to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999).

> [An appellate] court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

*Id.*

In this case, there was no reasonable possibility that any error in the circuit court's failure to give a limiting instruction may have contributed to the Defendants' convictions. In his testimony, Dr. Ritson plainly distinguished between the CW's actual injuries and the potential complications that the CW could have suffered. During the cross-examination of Dr. Ritson and the CW, the defense emphasized the point that the CW did not actually suffer any of the potential complications from his broken ribs such as pneumonia or a collapsed lung. In addition, the circuit court's instructions on Assault 1 and Attempted Assault 1 properly advised the jury on how the offenses differed in terms of the proof required with respect to the CW's injuries. The DPA in his closing argument further made clear that Assault 1 required proof that the defendant actually caused serious bodily injury, whereas Attempted Assault 1 only required proof that the defendant intended to cause serious bodily injury. Under these circumstances, there is no rea-

sonable possibility that the jury may have used evidence of the complications the CW could have suffered, but did not, to establish the Assault 1 charges. The absence of a limiting instruction did not affect the Defendants' substantial rights.[15]

In *Malufau I*, the court held that the error in admitting the doctor's testimony on what could have happened if the victim had not been treated was not harmless because of the "scant relevant evidence" introduced on the victim's actual injury. *Malufau I*, 80 Hawai'i at 132, 906 P.2d at 618. Indeed, the court concluded that the evidence regarding the extent of the victim's actual injury was so weak that it reversed Malufau's Assault 1 conviction based on the insufficiency of the evidence. *Id.* at 133, 906 P.2d at 619. In contrast, the State here presented considerable evidence that the CW's eight broken ribs constituted serious bodily injury.

Finally, the prescribed punishment for Attempted Assault 1 is the same as Assault 1. The Defendants may not have wanted or cared to distinguish between the evidence necessary to prove Assault 1 and Attempted Assault 1 because conviction on either offense exposed them to the same punishment. Thus, although the Defendants were entitled to a limiting instruction, they may have chosen not to ask for one. Under the circumstances of this case, the circuit court's failure to give a limiting instruction *sua sponte* did not constitute plain error.[16]

## III.

Robert contends that his trial counsel provided ineffective assistance for failing to object to the admission of Dr. Ritson's testimony regarding the potential complications

---

15. This is especially true of Meyers who was convicted of Attempted Assault 1 and not Assault 1.

16. Robert also claims that the circuit court plainly erred in permitting Dr. Ritson to testify about the complications that could have arisen from the CW's facial lacerations if they had not been sutured. We reject this claim for the same reasons we rejected the Defendants' arguments concerning Dr. Ritson's testimony about the potential complications arising from the CW's broken ribs. Dr. Ritson's testimony that the CW's lacer-

ations, if not sutured, "probably" would have resulted in significant scarring and deformity was relevant to whether the Defendants had committed the included offense of Attempted Assault 1. Moreover, the circuit court's failure to give a limiting instruction *sua sponte* with respect to this testimony clearly did not affect the Defendants' substantial rights. It was apparent from the prosecution's closing argument that the prosecution was relying on the CW's rib injuries, and not his facial lacerations, to show that the CW had suffered serious bodily injury.

from the CW's injuries as being irrelevant. We disagree. As noted above, Dr. Ritson's testimony was relevant to the included offense of Attempted Assault 1 and therefore admissible. Robert's trial counsel was not ineffective for failing to object to Dr. Ritson's testimony on the ground of relevance.

■ Robert did not argue on appeal that his trial counsel was ineffective for failing to request a limiting instruction. Robert is not entitled to relief on a ground he failed to raise on appeal. *See* HRAP Rule 28(b)(7). In any event, for reasons previously stated, we do not believe that the failure of Robert's trial counsel to request a limiting instruction reflected "counsel's lack of skill, judgment or diligence" or resulted in the "withdrawal or substantial impairment of a potentially meritorious defense." *State v. Antone*, 62 Haw. 346, 348–49, 615 P.2d 101, 104 (1980). In particular, Robert would be subject to the same penalty if convicted of Assault 1 or Attempted Assault 1. HRS § 705–502 (1993). Given this circumstance, Robert's counsel may not have wanted to emphasize to the jury that Robert could be convicted of Attempted Assault 1 if Robert intended to cause serious bodily injury, even if the actual injuries sustained by the CW did not amount to serious bodily injury necessary for Assault 1. *See Antone*, 62 Haw. at 352, 615 P.2d at 106 ("Defense counsel's tactical decisions at trial generally will not be questioned by a reviewing court.").

## IV.

Meyers claims that the circuit court erred in instructing on the included offense of Attempted Assault 1. Meyers argues that Attempted Assault 1 is not a lesser included offense of Assault 1 and thus instructing on Attempted Assault 1 was improper. Relying on *Malufau II*, Meyers further argues that the circuit court's instructing on Attempted Assault 1 violated the double jeopardy clauses of the Hawai'i and the United States Constitutions. Meyers's claims are without merit.

■ Although Attempted Assault 1 is not a *lesser* included offense of Assault 1 because both offenses are of the same class and grade, *Malufau II*, 80 Hawai'i at 138, 906 P.2d at 624, Attempted Assault 1 is an *included* offense of Assault 1. *Id.* HRS § 701–109(4)(b) (1993) provides:

> (4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
>
> . . . .
>
> (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein[.]

Under HRS § 701–109(4)(b), the circuit court properly instructed the jury on the included offense of Attempted Assault 1.

■ Meyers's double jeopardy argument is flawed on a number of levels. First, his argument is premised on his assumptions that: 1) there was insufficient evidence to prove the serious bodily injury element of Assault 1; and 2) proof that the defendant actually caused serious bodily injury is necessary to establish both Assault 1 *and* Attempted Assault 1. Both assumptions are wrong. We have already held that there was sufficient evidence to show that the CW suffered serious bodily injury and that Attempted Assault 1 only requires proof that the defendant intended to cause serious bodily injury. Because Meyers's assumptions are false, his conclusion fails.

Second, Meyers's reliance on *Malufau II* is misguided. *Malufau II* held that where an appellate court determines that there was insufficient evidence to support a defendant's Assault 1 conviction, allowing *retrial* on Attempted Assault 1 (an offense of the same class and grade as Assault 1) would be inequitable and contrary to the purposes of the double jeopardy clause. *Malufau II*, 80 Hawai'i at 138, 906 P.2d at 624. Here, we are not dealing with a remand for a retrial after an appellate determination of insufficient evidence on an Assault 1 charge. Instead, we examine the double jeopardy implications of the circuit court's instructing the jury on the included offense of Attempted Assault 1 at Meyers's first trial. The circuit court's instructing the jury on the included offense of Attempted Assault 1 only placed Meyers in jeopardy once. The court's actions did not violate Meyers's double jeopardy rights.

CONCLUSION

The Judgments filed respectively against Defendants–Appellants Manuel Kupahu, Robert Kuhio Kupahu, and Guy K. Meyers on May 12, 2004, in the Circuit Court of the First Circuit are affirmed.

