173 P.3d 592

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Mickey A. MADDOX, Defendant–Appellant.**

**No. 27523.**

Intermediate Court of Appeals of Hawai'i.

Dec. 11, 2007.

448

Matthew S. Kohm, on the briefs, Wailuku, for Defendant–Appellant.

Brandon L.K. Paredes, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., WATANABE, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

This case arises out of an altercation between Defendant–Appellant Mickey A. Maddox (Maddox) and Dale Mota (Mota). Mota was the new boyfriend of Maddox's ex-girlfriend, Jane Barton (Barton). Maddox arrived unexpectedly at the residence shared by Barton and Mota late one evening, and a fight ensued between Maddox and Mota. During the fight, Maddox stabbed Mota in the chest with the knife blade of a utility tool. The knife blade penetrated very close to Mota's heart, but missed the heart as well as other important organs and vessels. Maddox and Mota accused each other of being the initial aggressor and Maddox claimed self-defense.

Maddox was indicted on charges of first degree assault and first degree burglary. After a jury trial, Maddox was found guilty as charged of first degree assault and guilty

of the included offense of second degree criminal trespass.[1] Prior to sentencing, Plaintiff–Appellee State of Hawai'i (the State) filed a motion for an extended term of imprisonment on the first degree assault charge, asserting that Maddox qualified as a persistent offender under Hawaii Revised Statutes (HRS) § 706–662(1) (Supp.2003), because he had two or more prior convictions for felonies committed at different times while he was an adult, and as a multiple offender under HRS § 706–662(4) (Supp. 2003), because he was being sentenced while already under sentence of imprisonment for a felony.[2] The State also moved for a mandatory minimum period of imprisonment pursuant to HRS § 706–606.5 (Supp.1999) based on Maddox's status as a repeat offender.

The Circuit Court of the Second Circuit (circuit court) granted the State's motions and sentenced Maddox to an extended term of twenty years of imprisonment and a mandatory minimum of three years and four months on the first degree assault conviction. The circuit court sentenced Maddox to thirty days of imprisonment on his second degree criminal trespass conviction. In imposing sentence, the circuit court noted, among other things, that Maddox had engaged in a pattern of escalating violence and criminality. The court also ordered Maddox to pay $13,972.13 in restitution with the manner of payment to be determined by the Director of the Department of Public Safety.

Maddox appeals from the circuit court's Judgment entered on September 14, 2005. On appeal, Maddox argues that: 1) there was insufficient evidence to prove that Mota's injury "created a substantial risk of death," proof that was necessary to establish the "serious bodily injury" element for first degree assault; 2) the circuit court erred in permitting Mota's treating physician to testify that Mota's stab wound created a substantial risk of death because such testimony invaded the province of the jury; 3) the circuit court violated Maddox's right of confrontation when it disallowed cross-examination or inquiry into Mota's past to show his character for violence; 4) the Deputy Prosecuting Attorney (DPA) engaged in prosecutorial misconduct; 5) the circuit court committed numerous sentencing errors, including imposing an extended term of imprisonment in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and ordering restitution without determining Maddox's ability to pay and delegating the manner of payment to the Director of the Department of Public Safety; and 6) Maddox received ineffective assistance of counsel at trial and at sentencing.

We hold that there was insufficient evidence to prove that Mota's injury created a substantial risk of death and therefore vacate

1. The Honorable Reinette Cooper presided over the trial and the Honorable Shackley F. Raffetto presided over sentencing.

2. At the time of the alleged offenses, Hawaii Revised Statutes (HRS) § 706–662 (Supp.2003) provided in relevant part as follows:

 § **706–662 Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:

 (1) The defendant is a persistent offender whose imprisonment for an extended term is necessary for protection of the public. The court shall not make this finding unless the defendant has previously been convicted of two felonies committed at different times when the defendant was eighteen years of age or older.

 . . . .

 (4) The defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an extended term is necessary for protection of the public. The court shall not make this finding unless:

 (a) The defendant is being sentenced for two or more felonies or is already under sentence of imprisonment for felony; or. . . .

 In its motion for an extended term of imprisonment, Plaintiff–Appellee State of Hawai'i (the State) claimed that Defendant–Appellant Mickey A. Maddox (Maddox) had the following prior felony convictions: 1) a California conviction for Force/Assault with a Deadly Weapon not Firearm; 2) California convictions for Inflict Corporal Injury on Spouse/Co-habitant and Threaten Crime with Intent to Terrorize; 3) a Colorado conviction for Menacing; and 4) a Hawai'i conviction for Attempted Theft in the Second Degree. The State alleged that Maddox was being sentenced while already under a sentence of imprisonment for his Hawai'i felony conviction for attempted second degree theft.

Maddox's conviction for first degree assault. Because, however, there was ample evidence to prove that Maddox committed the lesser included offense of second degree assault, we remand the case with instructions that the circuit court enter a judgment of conviction on the lesser included offense. We further hold that the circuit court erred in imposing an extended term of imprisonment and ordering the payment of restitution. We remand the case for resentencing on the lesser included offense of second degree assault.[3]

## STATEMENT OF FACTS

### I.

Maddox was in a boyfriend-girlfriend relationship with Jane Barton for about four months beginning in April 2003. For one month during their relationship, Maddox lived with Barton at a Kekolu Street residence. In July 2003, Maddox abruptly ended his relationship with Barton and reunited with his high school sweetheart, Lorrie Smith (Smith). Barton was hurt emotionally and had a difficult time coping with the breakup. For a period of time, Barton went almost every day to visit Maddox at the house Maddox was sharing with Smith.

Toward the end of September 2003, Barton stopped having contact with Maddox, and in October 2003, she began dating Mota. In early March 2004, Barton received tax documents in the mail addressed to Maddox. By this time, Barton was living with Mota at the Kekolu Street residence. Barton asked a friend of Maddox to notify Maddox about the tax documents. On March 4, 2004, Maddox went to Barton's house to pick up the tax documents. Barton was not home, so Maddox left a mailing address where Barton could send the tax documents with Barton's landlord, who also lived at the Kekolu Street residence.

The next evening, after 11:00 p.m., Maddox returned to Barton's residence. Barton testified at trial that she was getting ready for bed when she heard a car pull up, the dogs begin to bark, and the back gate open. Mota

was asleep in the bedroom. Barton walked down the hallway to the kitchen and saw Maddox entering the residence through the back door. Startled, Barton said, "Oh my God, what are you doing here? Just to say hello?"

According to Barton, she then told Maddox that he had to leave, but Maddox just stood there. Barton heard Mota call out from the bedroom and ask her, "Janey, who's there?" Maddox replied in a loud voice, "Come out and find out." Then Maddox looked at Barton and told her, "Now I'm going to ruin your life."

Mota got up and walked to the kitchen where he saw Maddox. Mota testified at trial that he asked Maddox, "Who are you?" and that Maddox identified himself as "Mickey." Mota told Maddox that Maddox had to leave because it was late and Mota and Barton had to work the next day.

According to Mota, he put his hand on Maddox's lower back and led Maddox toward the back door. Maddox pushed Mota's hand away, got close to Mota's face, and put his hand on Mota's chest in a threatening manner. They pushed each other, Maddox lunged at Mota, and Mota was able to secure Maddox in a headlock. Mota told Maddox to settle down. Mota released Maddox from the headlock after fifteen or twenty seconds when Maddox indicated he had calmed down. After releasing Maddox, Mota told him, "I don't know who you think you are, coming over here at 11:30 at night, you know, without calling, because we gotta to go work in the morning, dude." In response, Maddox said, "Well, I'm going to show you who I am." Maddox then turned, took out a Leatherman utility tool, and opened the knife blade.

Maddox looked at Mota with "a crazed look to his eyes." Fearing attack, Mota retreated to his bedroom and attempted to close the door. Maddox forced the door open. Maddox swung his arm around the door and stabbed Mota in the chest with the knife blade of the utility tool. They wrestled

---

**3.** There were no errors affecting the validity of Maddox's conviction and sentence for second degree criminal trespass. We therefore affirm the Judgment as to the criminal trespass conviction and sentence.

over the knife, with Maddox trying to stab Mota again. Mota was eventually able to take the knife away from Maddox and gain control of Maddox while they continued to grapple in close quarters. Mota tried to put Maddox to sleep by cutting off the blood flow to his brain with a sleeper hold. Maddox bit Mota twice in the chest and Mota tried to "will" the knife into the back of Maddox's neck and to stab Maddox in the arm pit. Mota was on top of Maddox when he heard the police arrive. Mota threw the knife out of reach and told the police that "[i]t's clear in here."

Barton had called 911 while Maddox and Mota were fighting in the bedroom. Maui police officer Darrell Ramos testified that he responded to Barton's Kekolu Steet residence at about 11:30 p.m. Officer Ramos testified that he encountered Barton, who appeared to be frightened. Barton told Officer Ramos that there were two people fighting in the house and that "Mickey has a knife." Officer Ramos separated Mota and Maddox and placed Maddox in handcuffs. Officer Ramos detected the odor of alcohol on Maddox's breath. Maddox staggered as he walked from the bedroom to the living room, and his speech was slurred. Officer Ramos observed blood on Maddox's shirt, a long scratch on his face, a cut on the back of his neck that was about a quarter inch long and a quarter inch deep, and abrasions on his arms. Officer Ramos arrested Maddox and transported him to the police station. At the station, Maddox declined treatment for his injuries.

## II.

Mota was taken by ambulance to Maui Memorial Medical Center, where he was treated by Dr. David Nelson, the emergency room doctor. Dr. Nelson testified that he examined a two-inch-long stab wound to Mota's chest by putting his finger into the wound to see how deep it went. The wound track went down between Mota's ribs, inside the chest, and adjacent to the heart. Dr. Nelson felt that the depth and direction of the wound track made it a "very serious problem." The location of the stab wound raised concerns about potential damage to

the heart, great vessels, lungs, liver, gall bladder, and stomach. A series of diagnostic imaging was conducted to determine "what had been cut inside [Mota's] chest." Chest x-rays indicated no collapse of Mota's lungs. A computerized tomography (CT) scan of Mota's chest showed air bubbles immediately adjacent to the heart, which indicated that the wound track "went right up alongside the heart." A cardiac echogram, however, showed no severe bleeding from the heart.

The diagnostic imaging indicated that there was no immediate need for surgery or to insert a chest tube. There was no indication of any severe injury to Mota's heart, a heart laceration, a great vessel cut, or a collapsed lung. Mota was hemo-dynamically stable and there was no severe bleeding from Mota's wound. Mota was placed in the intensive care unit for observation in case of delayed bleeding. After being observed overnight and undergoing a repeat x-ray, Mota was released from the hospital. Ultimately, the only treatment Mota received for the stab wound was that the wound was cleaned and bandaged, without being sutured, and Mota was given antibiotic and tetanus shots and pain medication.

Dr. Nelson testified on direct examination that Mota's stab wound created a substantial risk of death, explaining that "[i]t was a stab wound directly towards his heart." On cross-examination, Dr. Nelson acknowledged that the blade missed Mota's lungs. He disagreed, however, with defense counsel's assertion that the stab wound did not create a risk for a collapsed lung:

> [Dr. Nelson]: That's not true. It did create a risk. If you're stabbed in the chest, you can collapse your lung. If you're damned lucky, the knife misses your lung.

Dr. Nelson stated that "[m]iraculously, [the blade] did not injure any important internal organs." But he insisted that Mota's stab wound created a "life-threatening risk, including damage to the lungs, heart, great vessels, spleen, liver, many important organs." Dr. Nelson testified that "[j]ust because you survive a serious or life-threatening injury does not mean it was not life threatening." Dr. Nelson added that

"[Mota] was damn lucky not to die from this...."

Mota was discharged from the hospital approximately fourteen hours after being admitted. He returned to work five days later, but went home after a couple of hours because he was in pain and felt a little dizzy. After resting four more days, he returned to work and performed light duty for a few days before resuming his normal work activities.

### III.

Maddox testified in his own defense at trial. Maddox stated that after his breakup with Barton, she would come by every day to visit and often got emotional. To avoid being pestered by Barton, Maddox and Smith moved to new addresses which Maddox attempted to keep secret from Barton. By January 2004, Barton stopped communicating with Maddox. Maddox heard that Barton had a new boyfriend. Maddox was not jealous but relieved by this news. Prior to the charged incident, Maddox had never met Mota and did not know that Mota was living with Barton.

Maddox was informed by a friend that Barton had received tax documents addressed to Maddox. Even though Maddox had left his mailing address with Barton's landlord on March 4, 2004, Maddox decided to go to Barton's house the following evening because he was not confident the landlord would give the address to Barton.

According to Maddox, he drove by Barton's house at about 9:20 p.m. but did not see her truck there. He visited a friend and then looked for Barton at a bar and nightclub she used to frequent. He returned to Barton's house and saw her truck parked in the driveway. Maddox walked through a gate to the back door. He was familiar with the residence because he had previously lived there with Barton.

Maddox testified that he saw the light on in Barton's bedroom, knocked underneath the window, and called out, "Jane, are you home? It's me Mickey." He then proceeded to the back door and knocked. Barton came to the door and opened it. She looked surprised and said, "Oh, my God, Mickey." Before Maddox could explain that he came over to pick up his tax documents, he heard Mota call out and ask who was there.

Mota came out of the bedroom. Maddox introduced himself and leaned forward to shake Mota's hand. Mota said, "I know who the f you are" and "What the f are you doing here?" Mota shoved Maddox and then punched him in the face, breaking Maddox's molar. Mota placed Maddox in a headlock and Maddox twice bit Mota in the chest, which enabled Maddox to break free. Mota then tackled Maddox from behind into the hallway. Maddox landed face first with Mota on top. Mota punched Maddox in the back of the head and threatened to kill him. Maddox pulled out his Leatherman utility tool with the intent of using it to defend himself, but Mota took it away. Mota hit Maddox on the back of the head three times with the utility tool, then Mota used a knife blade from the tool to stab Maddox in the back of the head. As Maddox attempted to take the utility tool away from Mota, Maddox sustained cuts to his hand, face, and shoulder.

Maddox testified that he was able to grab the blade, which Mota was still holding, and turn it toward Mota. Maddox shoved the blade as hard as he could into Mota's chest. Mota pulled back upon being stabbed and Maddox scrambled forward toward the bedroom. Mota followed and pushed Maddox into the bedroom. Mota threw Maddox around the bedroom, eventually tackling Maddox onto the bed and placing a choke hold on him. Mota maintained possession of the knife while they were in the bedroom. Maddox felt as if he was being choked to death and believed he would be dead if the police had not arrived. Maddox stated that when the police arrived, he was still groggy and confused from being beaten and choked unconscious.

Maddox testified that he was 5 feet 8 inches and 148 pounds and that Mota was a lot bigger. Maddox testified that he declined treatment for his injuries when he was taken to the police station because he wanted to first wash the blood off his body and the police would not let him.

## DISCUSSION

### I.

### A.

■ Maddox argues that the State failed to prove the "serious bodily injury" element of the first degree assault charge because there was insufficient evidence to prove that Mota's stab wound created a "substantial risk of death." We agree.

The State charged Maddox with first degree assault in violation of HRS § 707–710(1) (1993). HRS § 707–710(1) provides:

A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.

HRS § 707–700 (1993), in turn, defines "serious bodily injury" to mean *"bodily injury which creates a substantial risk of death* or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." (Emphasis added.)

The State's theory of prosecution was that the stab wound to Mota's chest constituted serious bodily injury because it created a substantial risk of death. Indeed, with the agreement of the parties, the circuit court's instructions to the jury limited the definition of serious bodily injury to "bodily injury which creates a substantial risk of death." Thus, to convict Maddox of first degree assault, the State was required to prove that Maddox caused "bodily injury which create[d] a substantial risk of death."

The question raised in this appeal is whether a stabbing injury that is caused by a knife blade that penetrates close to vital internal organs and vessels but misses without harming them, so that the injury quickly resolves itself without the need for significant treatment, creates a substantial risk of death within the meaning of HRS § 707–700. We conclude that such an injury does not create a substantial risk of death.

■ In construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language con-tained in the statute itself." *State v. Reis,* 115 Hawai'i 79, 84, 165 P.3d 980, 985 (2007). "Absent an absurd or unjust result, we are bound to give effect to the plain meaning of unambiguous statutory language[.]" *Id.* (citation omitted).

■ We construe the plain language of HRS § 707–700 to mean that it must be *the bodily injury* that creates the substantial risk of death. Thus, the fact that the victim could have sustained a life-threatening injury if the stab wound had taken a slightly different path and the victim was exceedingly lucky to have escaped a life-threatening injury does not establish that the victim's injury created a substantial risk of death. In other words, the phrase "bodily injury which creates a substantial risk of death," as used in the HRS § 707–700 definition of "serious bodily injury," focuses on the risks created by the injury sustained by the victim rather than the risks created by the defendant's conduct. Demonstrating that the defendant's conduct created a substantial risk of death, by itself, is not sufficient to satisfy the statutory definition.

### B.

Our interpretation of the HRS § 707–700 definition of "serious bodily injury" is supported by cases from other jurisdictions that have construed similar statutory language in the same way. *E.g., State v. Gerald,* 486 N.W.2d 799 (Minn.Ct.App.1992); *Stroup v. People,* 656 P.2d 680 (Colo.1982) (en banc); *Wilson v. State,* 695 So.2d 195 (Ala.Crim. App.1996). In *State v. Gerald,* the defendant was charged with first degree assault based in part on a knife wound the victim sustained to his ear. *Gerald,* 486 N.W.2d at 801–802. The Minnesota Court of Appeals noted that under the applicable Minnesota statutes, "a person commits first degree assault if he or she assaults another and inflicts great bodily harm." *Id.* at 801. "Great bodily harm" was defined by statute to include "bodily injury which creates a high probability of death...." *Id.* The defendant appealed his conviction for first degree assault on the ground that there was insufficient evidence to prove that he inflicted great bodily harm on the victim. *Id.* at 801.

On appeal, the prosecution argued that the evidence was sufficient to show that the victim's ear injury created "a high probability of death" because "the cut in [the victim's] ear was very close to a major vein and artery and [the victim] could have bled to death if either the vein or artery had been severed." *Id.* at 802. During trial, the prosecution had asked the victim's treating physician numerous questions about the serious injuries the victim could have sustained had the knife cut a major vein, but conceded during closing argument that none of these serious injuries had occurred. *Id.* at 802. The Minnesota Court of Appeals held that there was insufficient evidence to prove that the victim's injury created a high probability of death, stating as follows:

> We believe the state misreads the high probability of death portion of the great bodily harm statute. The statute defines great bodily harm as "*bodily injury* which creates a high probability of death." [Minn.Stat. § 609.02 subd. 8 (1990)] (emphasis added). Under the plain language of the statute, the injury itself must be life-threatening. *The fact that a lesser injury is located near a major organ or vessel and therefore could have been more serious is not sufficient to satisfy the statute.*

*Id.* at 802 (emphasis to last sentence added). The court further noted that "[t]he great bodily harm element as defined by the legislature mandates that we focus on injury to the victim rather than the actions of the assailant." *Id.* at 802.[4]

In *Stroup v. People,* the defendant was charged and convicted of first degree assault. Under the Colorado law applicable to that charge, a person commits first degree assault if "[w]ith intent to cause serious bodily injury to another person, he causes serious bodily injury to any person by means of a deadly weapon...." *Stroup,* 656 P.2d at 685. The term "serious bodily injury" was defined by statute "*as bodily injury which involves a substantial risk of death,* serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body." *Id.* The Colorado Supreme Court held that the plain language of the "serious bodily injury" definition "focuses on the injury the victim actually suffered rather than the risk to the victim posed by the defendant's conduct." *Id.*

The Colorado Supreme Court addressed whether the trial court erred in admitting testimony of the prosecution's medical expert that was offered to prove that the victim suffered serious bodily injury.[5] At trial, the "medical expert was allowed to testify that the stab wound to the victim's forehead created a 'substantial risk of death' because the knife would have penetrated the brain had the point of entry been a fraction of an inch to the right or left." *Id.* at 686. The Colorado Supreme Court concluded that such testimony was not relevant to prove that the victim suffered serious bodily injury, which was the sole ground offered by the prosecution for its admission, and thus the trial court erred in admitting the testimony:

> While such testimony as to the gravity of the risk created by the defendant's conduct may be relevant as circumstantial evidence of his intent to inflict serious bodily injury, *such evidence is irrelevant to prove that the defendant's acts caused a substantial risk of death to the victim based on the actual injuries inflicted.* The trial court, therefore, erred in allowing this testimony to be considered by the jury, over defense counsel's objection, in determining whether the victim suffered serious bodily injury.

*Id.* (footnote omitted and emphasis added).

Our conclusion that the HRS § 707–700 definition of "serious bodily injury" requires that the substantial risk of death flow from the bodily injury rather than the defendant's conduct is supported by the

---

4. The Minnesota Court of Appeals also rejected the prosecution's arguments that other portions of the "great bodily harm" definition had been met in concluding that there was insufficient evidence to sustain the defendant's conviction for first degree assault. *State v. Gerald,* 486 N.W.2d 799, 802–03 (Minn.Ct.App.1992).

5. The Colorado Supreme Court addressed this issue in the context of a post-conviction proceeding brought by defendant to set aside his conviction on the ground that his counsel had provided ineffective assistance by not filing a direct appeal raising this issue. *Stroup v. People,* 656 P.2d 680, 682–86 (Colo.1982) (en banc).

criminal attempt provisions of the Hawaii Penal Code. The Hawaii Penal Code makes a person's attempt to commit a crime an included offense of the same class and grade as the offense which is attempted. HRS §§ 705–500, 705–502, 701–109(4)(b) (1993). Evidence that a stab wound narrowly missed a vital organ that if hit would have created a substantial risk of death is relevant and admissible to prove the offense of attempted assault in the first degree. *See State v. Meyers,* 112 Hawai'i 278, 289, 145 P.3d 821, 832 (App.2006) (citing *State v. Malufau,* 80 Hawai'i 126, 130 n. 6, 906 P.2d 612, 616 n. 6 (hereinafter *"Malufau I "*), *reconsideration granted on other grounds,* 80 Hawai'i at 134, 906 P.2d at 620 (1995)). Thus, the offense of attempted first degree assault is available to address situations where the defendant's *conduct* creates a substantial risk of death. This reinforces our view that the offense of first degree assault is limited to cases in which a substantial risk of death is created by the *bodily injury* sustained by the victim.[6]

In this case, Maddox was not charged with attempted first degree assault. In addition, the State did not request, and the court did not give, an instruction on attempted first degree assault as an included offense of the charged offense of first degree assault. Thus, the question of whether Maddox committed the offense of attempted first degree assault was not before the jury.

## C.

The evidence regarding Mota's stab wound, which came primarily from Dr. Nelson's testimony, was largely undisputed. Even when viewed in the light most favorable to the State, the evidence was insufficient to show that Mota's bodily injury created a substantial risk of death. The evidence showed that Mota was stabbed with the knife blade of a utility tool that penetrated into Mota's chest and came very close to his heart. Although the location and depth of the stab wound initially raised concerns about possible damage to Mota's heart, other vital organs, and the great vessels in the area, subsequent diagnostic imaging and examination revealed that the blade "miraculously" had missed all of the important organs and vessels. Mota was hemo-dynamically stable and there was no severe bleeding from the wound. Dr. Nelson did not stitch the wound and only treated it by bandaging it and giving Mota antibiotic and tetanus shots and pain medication. Mota was admitted to the hospital shortly after the incident but released about fourteen hours later. He went to work about a week after sustaining the injury and was back to his normal work activities within about two weeks. There was no evidence that Mota suffered any complications from the stab

**6.** We note that there is dicta in a footnote in *State v. Malufau,* 80 Hawai'i 126, 130 n. 6, 906 P.2d 612, 616 n. 6 (hereinafter *"Malufau I "*), *reconsideration granted on other grounds,* 80 Hawai'i at 134, 906 P.2d at 620 (1995), which can be read as suggesting that whether an injury creates a substantial risk of death turns on the defendant's conduct. In *Malufau I,* the Hawai'i Supreme Court stated in footnote 6 that:

> [W]hen the prosecution seeks to prove that an injury "create[d] a substantial risk of death," expert medical testimony regarding the risk of death that the defendant's actions created would clearly be relevant. In this context, evidence regarding what the severity of the injuries would have been absent medical attention is relevant, but only to the extent that it relates to the risk of death that the defendant's actions created.

*Malufau I,* 80 Hawai'i at 130 n. 6, 906 P.2d at 616 n. 6. The defendant in *Malufau I* was charged with first degree assault on the theory that the injury he inflicted on the victim caused

"serious, permanent disfigurement." *Id.* at 130, 906 P.2d at 616. The issue facing the supreme court was whether "expert medical testimony regarding what the severity of [the victim's] injury would have been absent medical attention is relevant to whether an injury actually caused 'serious, permanent disfigurement.' " *Id.* The court held that such expert testimony is not relevant to prove "serious, permanent disfigurement." *Id.* The court went on to note in footnote 6 that such expert testimony would clearly be relevant where an assault charge was based on the theory that the victim's injury created a substantial risk of death. *Id.* at 130 n. 6, 906 P.2d at 616 n. 6.

The supreme court's decision in *Malufau I* did not turn on an interpretation of the phrase "bodily injury which creates a substantial risk of death" as used in the HRS § 707–700 (1993) definition of serious bodily injury. We therefore view the supreme court's suggestion in footnote 6 of *Malufau I* that this phrase focuses on the risks created by the defendant's actions to be dicta that is not binding on this court.

wound which apparently healed on its own.[7]

■ It is true that Dr. Neslon testified that, in his opinion, Mota's stab wound created a substantial risk of death. However, a review of the record shows that Dr. Nelson applied the wrong legal standard in rendering his opinion. Dr. Nelson's opinion was based on his view that Mota's injury would have created a substantial risk of death if the blade had taken a slightly different path and hit Mota's heart, other vital organs, or important vessels. Thus, Dr. Nelson's opinion was based on the risks associated with Maddox's conduct in stabbing Mota, and not on the risks associated with the actual injury sustained by Mota, which the undisputed evidence shows was not life-threatening. The substantial risk of death must arise from the injury that actually occurred, not from a different injury that could have been caused by the defendant's conduct but did not occur. We therefore conclude that Dr. Nelson's bare opinion, which was based on a misunderstanding of the legal definition of "serious bodily injury" and was inconsistent with the medical evidence presented regarding Mota's injury, did not constitute substantial evidence to support Maddox's conviction.

### D.

■ Although the evidence was insufficient to show that Maddox committed the offense of first degree assault, there was ample evidence to show that he committed the lesser included offense of second degree assault in violation of HRS § 707–711(1)(a) (1993). Second degree assault under HRS § 707–711(1)(a) only requires that the defendant "intentionally or knowingly causes *substantial bodily injury* to another[.]" (Emphasis added.) The term "substantial bodily injury" is defined to include "bodily injury which causes ... [a] major avulsion, laceration, or penetration of the skin[.]" HRS

§ 707–700 (Supp.2006). The Hawai'i Supreme Court has noted:

> it is well established that if an appellate court deems the evidence insufficient as a matter of law to support a jury's guilty verdict on a greater offense but finds the evidence sufficient to support a conviction on a lesser included offense, it may enter a judgment of conviction on that lesser included offense.

*State v. Mueller*, 102 Hawai'i 391, 397, 76 P.3d 943, 949 (2003).

There was ample, indeed overwhelming, evidence that Mota's stab wound constituted "a major avulsion, laceration, or penetration of the skin." Maddox does not dispute that the evidence clearly established that Mota's injury satisfied the statutory definition for "substantial bodily injury." The jury, having returned a guilty verdict against Maddox for first degree assault, must also have found sufficient evidence to prove the lesser included offense of second degree assault in violation of HRS § 707–711(1)(a). Thus, while we vacate Maddox's conviction for first degree assault, we remand the case with instructions that the circuit court enter a judgment convicting Maddox of the lesser included offense of second degree assault in violation of HRS § 707–711(1)(a). *See Mueller*, 102 Hawai'i at 397–98, 76 P.3d at 949–50; *State v. Wallace*, 80 Hawai'i 382, 414–16, 910 P.2d 695, 727–29 (1996). Maddox endorses this approach as he argues in his brief that his first degree assault conviction should be overturned "and the lesser included offense of Assault in the second degree should be imposed."

### II.

Maddox argues that the circuit court erred in allowing Dr. Nelson to opine that Mota's injury created a substantial risk of death because this opinion invaded the province of the jury. Dr. Nelson's opinion was only rele-

---

7. Of course, a victim's injuries can create a substantial risk of death even if the victim survives. For example, a victim who would have bled to death absent medical intervention or who sustained a stab wound to the heart that would have been fatal but was remedied by surgery would qualify as a person with a bodily injury which created a substantial risk of death. A victim's bodily injury could also create a substantial risk of death if complications from the injury could have led to death. In these examples, however, the risk of death is created by the potential harm arising out of the actual injury sustained, rather than the potential harm arising out an injury that is different from, but close to, the injury that was sustained.

vant to whether Mota's injury satisfied the "serious bodily injury" element for first degree assault. In light of our decision to vacate Maddox's conviction for first degree assault, we need not decide Maddox's claim that Dr. Nelson's opinion testimony was inadmissible because it invaded the province of the jury.

### III.

Maddox contends that the circuit court violated his right of confrontation when it did not allow him to cross-examine Mota about Mota's past to show Mota's violent and aggressive character. Maddox claims that he was entitled to inquire into Mota's alleged past acts of violence to show that Mota was the first aggressor, which Maddox asserts was relevant to his claim of self-defense.

We conclude that the circuit court did not abuse its discretion in preventing Maddox from questioning Mota about Mota's alleged past acts of violence until evidence raising a factual issue as to whether Mota was the first aggressor was introduced. Maddox sought to cross-examine Mota about Mota's alleged past acts of violence when Mota testified during the State's case-in-chief. At that time, evidence to support a finding that Mota was the first aggressor had not yet been introduced. Such evidence was not introduced until Maddox testified in the defense case. However, after Maddox testified, he did not attempt to call Mota to question Mota about Mota's alleged past acts of violence. Under these circumstances, we conclude that the circuit court did not err.

### A.

Hawaii Rules of Evidence (HRE) Rule 404(a) (Supp.2006) generally prohibits evidence of a person's character for the purpose of proving that he or she acted in conformity therewith. However, under HRE Rule 404(a)(2), there is an exception for "[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused[.]" The HRE Rule 404(a)(2) exception applies mainly to homicide and assault cases where the defendant claims self-defense. See Commentary to HRE Rule 404 (1993).

In *State v. Lui*, 61 Haw. 328, 603 P.2d 151 (1979), the Hawai'i Supreme Court explained that under the common law, a defendant who claims self-defense to a homicide charge is permitted to introduce evidence of the deceased's character for violence or aggression for two purposes: 1) "to demonstrate the reasonableness of [the defendant's] apprehension of immediate danger;" or 2) "to show that the decedent was the aggressor." *Id.* at 329, 603 P.2d at 154. Where the character evidence is offered for the former purpose, the defendant must first lay a foundation that he or she knew of the deceased's character for violence at the time of the homicide. *Id.* Such a foundation regarding the defendant's knowledge of the deceased's character for violence is not required where the character evidence is offered for the latter purpose of showing that the deceased was the aggressor. *Id.* at 330, 603 P.2d at 154.

Nevertheless, evidence of the deceased's violent character offered to show that the deceased was the first aggressor is properly excluded where the evidence at trial does not support a factual dispute as to who was the aggressor. *Id.* The defendant in *Lui* shot the deceased, who was unarmed, from a distance of ten feet. *Id.* at 329, 603 P.2d at 153. The supreme court held that the trial court properly excluded evidence of the deceased's violent character because "the record does not support a factual dispute as to who was the aggressor." *Id.* at 330, 603 P.2d at 154.

The common law rule set forth in *Lui* was later codified as HRE Rule 404(a)(2) and made applicable to other charges besides homicide, such as assault. *State v. Basque*, 66 Haw. 510, 513, 666 P.2d 599, 602 (1983) (noting that the *Lui* rule regarding the use of a victim's criminal record to establish who was the first aggressor was later codified as HRE Rule 404(a)(2)); Commentary to HRE Rule 404 (1993) (citing *Lui* as consistent with HRE Rule 404(a)(2)); *State v. Adam*, 97 Hawai'i 413, 38 P.3d 581 (App.2001) (applying HRE Rule 404(a)(2) to assault charge). Maddox does not claim that he was aware of Mota's alleged violent character at the time of the charged assault. Thus, the only purpose for which evidence of Mota's character for violence could be offered under HRE

Rule 404(a)(2) would be to show that Mota was the first aggressor.

In *State v. Adam*, this court elaborated on the circumstances under which the defendant may introduce evidence of the victim's character for violence under HRE Rule 404(a)(2) to show who was the first aggressor:

> [W]hen the factual issue is, as between the defendant and the other person, who was the aggressor, the defendant may introduce evidence of the other person's violent or aggressive character. In other words, there must be evidence to support a finding that the defendant was the aggressor and there must be *contrary evidence to support a finding that the other person was the aggressor.* In the situation where there is evidence to support a finding that the defendant was the aggressor and *there is no evidence to support a finding that the other person was the aggressor, the defendant may not introduce evidence of the other person's violent or aggressive character.*

*Adam*, 97 Hawai'i at 418, 38 P.3d at 586 (emphases added). In other words, before the defendant is entitled to introduce evidence of the victim's character for violence, there must be sufficient evidence to support a finding that the victim was the first aggressor.

 The trial court is afforded broad discretion in determining the order and mode of interrogating witnesses and presenting evidence. HRE Rule 611(a) (1993) provides:

> **Rule 611 Mode and order of interrogation and presentation.** (a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless con-

sumption of time, and (3) protect witnesses from harassment or undue embarrassment.

According to the Commentary to HRE Rule 611, "[Subsection (a)] states the common-law principle allowing the court broad discretion in determining order and mode of interrogation" and is intended "to define broad objectives and to leave the attainment of those objectives to the discretion of the court."

 Thus, Mota's alleged character for violence was only admissible if there was evidence to support a finding that Mota was the first aggressor. In addition, the trial court had the discretion to prevent Maddox from questioning Mota about Mota's alleged character for violence until evidence to support a finding that Mota was the first aggressor had been introduced.[8] With these principles in mind, we turn to Maddox's claims.

### B.

Prior to trial, Maddox filed a notice of intent to rely on HRE Rule 404 evidence (the Rule 404 notice). Attached to the Rule 404 notice were certified copies of petitions for restraining orders, the corresponding restraining orders, and judgments of conviction for violating two of the restraining orders that were all filed against Mota in Oregon (collectively, the "Oregon court documents").[9] Maddox later filed a motion in limine for a hearing to determine the admissibility of evidence included in his Rule 404 notice. Maddox, in particular, sought to admit the allegations of violence made by the petitioners against Mota in the petitions for restraining orders, which can be summarized as follows:

1. In 1990, petitioner Tami Mota (Tami), who was then Mota's wife, alleged that Mota threw her into tables and chairs and hit her.

---

8. Under Hawaii Rules of Evidence (HRE) Rule 611 (1993), the trial court also had the discretion to permit Maddox to question Dale Mota (Mota) about Mota's alleged violent character before evidence supporting a finding that Mota was the first aggressor was introduced, subject to striking such questions and testimony if the requisite evidentiary foundation was not subsequently laid. While the court had the discretion to adopt this approach, it was not required to do so.

9. These documents reflect that the restraining orders were filed on the same day as the petitions for restraining orders. The restraining orders generally included a notice advising the respondent that the restraining order became effective immediately and that respondent was required to request a hearing if respondent wanted to contest the continuation of the order.

2. In 1994 and 1996, petitioner Ann Frasier (Frasier), who was then Mota's girlfriend, filed three petitions for restraining orders against Mota. Frasier alleged in the petitions that Mota, in separate incidents, split her lip open, pushed her and twisted her wrists, picked her up by the neck, and repeatedly threatened to kill her. Fraiser also alleged that Mota assaulted two male friends of hers at her place of employment.[10]

3. In 1999, petitioner April Collver (Collver), who was then Mota's girlfriend, alleged that Mota threatened and cut her with knives and a screwdriver, punched her, choked her, and burned her when he grabbed her while holding a lit cigarette.

Maddox's counsel advised the circuit court that the defense had been unable to locate Frasier and Collver, and that while Tami had been located, it would be "extremely difficult" for Tami to make arrangements to be on Maui to testify against Mota. The State filed a motion in limine to preclude, among other things, the defense from introducing prohibited character evidence. In support of its motion, the State argued that "[Maddox] cannot utilize any criminal history of Mr. Mota to show circumstantially that Mr. Mota was the first aggressor, and the absence of provocation on [Maddox's] part, *unless and until* he demonstrates a factual dispute as to who the first aggressor was." (Emphasis added.)

Prior to trial, the circuit court held a hearing on the motions in limine filed by Maddox and the State. Maddox argued that the allegations of violence by Mota contained in the Oregon court documents were relevant to show that Mota was the first aggressor in this case. Although Maddox acknowledged that there were potential hearsay questions regarding the admissibility of these documents, he argued that he should at least be allowed to question Mota about the allegations of violence. The State proffered the

evidence it expected to introduce regarding the charged assault, which was consistent with Mota's actual testimony subsequently adduced at trial. Based on its proffer, the State contended that Maddox was clearly the first aggressor and thus there was no issue as to who was the first aggressor.

The circuit court granted the State's motion in limine and precluded Maddox from questioning Mota about the alleged prior acts of violence. At the time of the court's ruling, only the State had proffered the evidence it expected to introduce at trial regarding the charged assault; Maddox had not proffered the details of his version of the altercation with Mota. In support of its ruling, the circuit court noted that it did not think there was "any evidence other than to show that [Maddox] is the aggressor, the first aggressor and the only aggressor in this incident." The court further stated that "if the evidence comes out as indicated[,]" it would be more prejudicial than probative to permit the hearsay allegations contained in the restraining order petitions to be admitted. Although the circuit court granted the State's motion in limine, it advised defense counsel that it would reconsider its ruling if the evidence at trial was different than proffered by the State.[11] The court informed defense counsel, "By all means, we can revisit this issue if the evidence doesn't pan out as described to me by [the DPA]. Okay?"

During his cross-examination of Mota in the State's case-in-chief, defense counsel renewed Maddox's request to question Mota about the bad acts alleged in the restraining order petitions. The circuit court denied Maddox's request. The court noted that the evidence showed that after Mota retreated to his bedroom, Mota "is in essence attacked from behind by Mr. Maddox with his leatherman tool." The court stated that "the evidence is clear at this point who was being aggressive that night" and that it did not

---

**10.** The documents submitted by Maddox reflect that Mota pleaded guilty to violating one of the 1994 restraining orders, was sentenced to probation, and twice had his probation revoked for contacting the petitioner Ann Frasier (Frasier) and failing to report to the probation officer. Mota was found to be in contempt of court for admittedly violating the other 1994 restraining

order by making a threatening phone call to Frasier and was sentenced to ninety days in jail.

**11.** At the same hearing, the circuit court also denied Maddox's corresponding motion in limine to admit evidence of Mota's prior acts of violence.

think the "factual pattern indicates anything questionable about who was being aggressive . . . ." The court reiterated that it believed the hearsay relating to the restraining orders was "way more prejudicial than probative" given that the incidents were "so old" and were not known to Maddox.

### C.

■ On appeal, Maddox argues that Mota's testimony raised the factual issue as to whether Mota had been the first aggressor and thus the circuit court abused its discretion in denying Maddox's requests to cross-examine Mota about Mota's history of violence as reflected in the Oregon court documents. We disagree.[12]

Mota's testimony did not constitute evidence that would support a finding that Mota was the first aggressor. Mota testified that he asked Maddox to leave because it was late and put his hand on Maddox's lower back to lead him to the door. When Maddox pushed Mota's hand away and made threatening moves toward Mota, Mota placed Maddox in a headlock, but released Maddox after Maddox agreed to calm down. After Maddox was released, Maddox opened up the knife blade of his Leatherman utility tool, chased Mota down the hallway to Mota's bedroom, and stabbed Mota in the chest. Based on Mota's testimony, there was no evidence to support a finding that Mota had been the first aggressor. Mota's testimony did not raise a factual issue regarding who was the first aggressor but instead plainly showed that Maddox was the first aggressor. Thus, the circuit court did not abuse its discretion in denying Maddox's requests to cross-examine Mota about past acts of violence because the requests were made before evidence to support a finding that Mota was the first aggressor had been introduced.

■ Once Maddox testified in the defense case, there was ample evidence to support a finding that Mota was the first aggressor. Maddox testified that Mota attacked him without provocation and that Mota hit and cut Maddox on the back of the head with the utility tool before Maddox was able to turn the tool toward Mota and stab Mota in the chest. At that point in the trial, Maddox was clearly entitled to question Mota about the past acts of violence reflected in the Oregon court documents. Maddox, however, did not attempt or seek permission to question Mota about past acts of violence *after* Maddox had introduced evidence supporting a finding that Mota was the first aggressor. Thus, the circuit court was never called upon to rule on whether such questions were permissible after the required evidentiary foundation had been laid. Under these circumstances, we cannot say that the circuit court erred.

### D.

■ We reject Maddox's alternate claim that he was entitled to cross-examine Mota about Mota's alleged past acts of violence to impeach Mota's credibility. Maddox fails to show any meaningful link between the alleged past acts of violence and Mota's truthfulness or his interest, bias, or motives in testifying. *See* HRE Rules 607, 608, and 609.1 (1993).[13]

### IV.

Maddox contends that the Deputy Prosecuting Attorney (DPA) engaged in miscon-

---

12. In his pretrial motions, Maddox argued that the petitions for restraining orders, restraining orders, and judgments of conviction for violating the restraining orders (collectively, the "Oregon court documents") were admissible pursuant to HRE Rules 404(a)(2) (Supp.2006) and 405(b) (1993) and the following exceptions to the hearsay rule: HRE Rules 803(b)(23) (1993), 803(b)(24) (1993), 804(b)(3) (1993), and 804(b)(8) (Supp.2006). On appeal, Maddox abandons his argument that the Oregon court documents were admissible, and he only argues that the trial court erred in denying his requests to cross-

examine Mota about the allegations of violence described in these documents.

13. We likewise reject Maddox's contention that he was entitled to inquire into Mota's alleged past acts of violence to attack Barton's credibility because such inquiry might raise questions about whether Barton testified falsely out of fear of Mota. There was no evidence to support a claim that Barton was afraid of Mota. In addition, Maddox did not present this argument in the trial court as a ground for his request to question Mota about the alleged prior acts of violence.

duct by: 1) disclosing in opening statement that the original charge against Maddox was attempted murder; 2) stating in closing argument that Maddox must be lying about the harm he sustained because he did not make a police report; 3) eliciting testimony from Dr. Nelson that Mota's injury created a substantial risk of death; 4) stating in closing argument that because Dr. Nelson was the only doctor who testified, Mota's injuries must have created a substantial risk of death, if they believed the doctor; and 5) stating in closing argument that Maddox declined medical treatment for his injuries because he wanted to avoid a test that would show his blood alcohol level. We conclude that the matters of which Maddox complains either did not constitute misconduct or were harmless beyond a reasonable doubt.

■■■■■ "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the appellate courts] consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

■■■ Although Maddox was apparently arrested on a charge of attempted murder, he was only indicted on a charge of first degree assault. We fail to see any valid reason for disclosing in opening statement that Maddox had originally been charged (by the police) with attempted murder. We likewise question the propriety of the DPA's arguing that Maddox must be lying about the harm he sustained because he failed to file a police report, which Maddox claims was an improper comment on his right to remain silent. Both these remarks, however, were brief and were interrupted by defense objections that were sustained by the circuit court. The court further struck the remarks and

immediately ordered the jury to disregard them. *See McGriff,* 76 Hawai'i at 160, 871 P.2d at 794 (stating that it is presumed that the jury will abide by the court's admonition to disregard a prosecutor's improper remarks). Under these circumstances, we conclude that any misconduct with respect to these remarks was harmless beyond a reasonable doubt and did not contribute to Maddox's conviction.

■■■ As previously noted, we have concluded that Dr. Nelson's opinion that Mota's stabbing injury created a substantial risk of death was legally erroneous. There was no misconduct, however, in the DPA's asking Dr. Nelson to testify regarding his opinion or in the DPA's arguing to the jury that it could rely on the doctor's opinion in its deliberations. We also disagree with Maddox's contention that the DPA's remark in closing argument—that the jury should believe Dr. Nelson's medical opinion because he was the only doctor to testify—somehow shifted the burden of proof to Maddox.

■■■ We reject Maddox's claim that the DPA improperly argued that Maddox declined medical treatment for his injuries to avoid revealing his blood alcohol level. The DPA's argument was based on reasonable inferences from evidence in the record. *See State v. Clark,* 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996). Moreover, there was ample evidence that Maddox had been drinking prior to the incident. Thus, even assuming, *arguendo,* that the DPA's comment was improper, it did not contribute to Maddox's conviction.

V.

■■■ Maddox argues that the circuit court erred in sentencing him to an extended term of imprisonment. We agree. Our decision to vacate Maddox's conviction on the first degree assault charge requires us to vacate his extended term sentence of twenty years of imprisonment, which was imposed on that charge. In addition, after briefing was completed in this case,[14] the Hawai'i Supreme Court decided *State v. Maugaotega,* 115 Hawai'i 432, 168 P.3d 562 (2007) (hereinafter·

14. Maddox submitted his reply brief in March 2007.

"*Maugaotega II*"). *Maugatoega II* was decided after the United States Supreme Court vacated the judgment in *State v. Maugaotega*, 107 Hawai'i 399, 114 P.3d 905 (2005) (hereinafter "*Maugatoega I*") and remanded the case to the Hawai'i Supreme Court for further consideration in light of *Cunningham v. California*, 549 U.S. ——, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007). *Maugaotega v. Hawai'i*, 549 U.S. ——, 127 S.Ct. 1210, 167 L.Ed.2d 37 (2007).

In *Maugaotega II*, the Hawai'i Supreme Court held that HRS § 707–662 (1993 & Supp.2003) violated the Sixth Amendment to the United States Constitution because the statute provided that the sentencing court, rather than the trier of fact, make findings necessary for the imposition of an extended term sentence. *Maugatoega II*, 115 Hawai'i at 446–47, 168 P.3d at 576–57. The court vacated the defendant's extended term sentences, which were imposed pursuant to HRS § 706–662(4)(a), and remanded the case "for non-extended term sentencing." *Id.* at 434, 168 P.3d at 564. Because Maddox's extended term sentence was imposed pursuant to HRS § 706–662, it was invalid under *Maugaotega II*.

We note that in the wake of *Maugaotega II*, the Hawai'i Legislature met in a second special session and passed House Bill No. 2, which was signed into law by the Governor on October 31, 2007, as Act 001 of the 2007 Second Special Session (hereinafter "Act 001") and took effect on that date. Act 001 amended HRS §§ 706–661, –662, and –664 and provides for a jury to find the facts necessary for the imposition of an extended term of imprisonment unless the right to a jury determination is waived by the defendant. Act 001 states that it "shall apply to all sentencing or resentencing proceedings pending on or commenced after the effective date of this Act, whether the offense was committed prior to, on, or after the effective date of this Act." Act 001 § 5.

We do not have the benefit of briefing by the parties on the interplay between Act 001 and *Maugaotega II*. We do not address this issue and express no opinion on how Act 001 may affect resentencing in this case. We remand the case to the circuit court to resolve in the first instance any disputes over resentencing.

## VI.

The circuit court ordered Maddox to pay $13,972.13 in restitution with the manner of payment to be determined by the Director of the Department of Public Safety. Maddox argues that the circuit court erred in ordering restitution without determining Maddox's ability to pay and delegating the manner of payment to the Director of the Department of Public Safety.

■ A sentencing court cannot delegate the determination of the manner of payment of restitution to another person or entity. *State v. Gaylord*, 78 Hawai'i 127, 153, 155, 890 P.2d 1167, 1193, 1195 (1995). In *Gaylord*, the Hawai'i Supreme Court stated that "it is incumbent upon the [sentencing] court to enter into the record findings of fact and conclusions that the manner of payment is reasonable and one which [the defendant] can afford." *Id.* at 153, 890 P.2d at 1193. The court further stated that "[i]t seems intuitively obvious to us that a sentencing court cannot determine restitution in an amount the defendant can afford to pay without determining the manner of payment." *Id.* at 153 n. 50, 890 P.2d at 1193 n. 50 (internal quotation marks omitted).

■ The State concedes that the circuit court erred in delegating the determination of the manner of payment of restitution to the Director of the Department of Public Safety. We agree and vacate the order of restitution. On remand, any order of restitution imposed by the circuit court must be supported by findings that show that the total amount of restitution as well as the manner of payment is reasonable and involve amounts Maddox can afford to pay. The circuit court must determine the manner of payment with respect to any order of restitution it imposes.

## VII.

■ Maddox argues that because Judge Reinette Cooper presided over the trial, it was error for a different judge, Judge Shack-

ley Raffetto, to sentence him. Maddox did not object to Judge Raffetto presiding over Maddox's sentencing and thus waived any claim of error in this regard. Maddox also claims that his counsel was ineffective for failing to object to Judge Raffetto presiding over sentencing. Maddox, however, has not shown that it was improper for Judge Raffetto to substitute for Judge Cooper in this case, and therefore Maddox has not met his burden of establishing that his counsel was ineffective in failing to object to the substitution. *See State v. Antone*, 62 Haw. 346, 348–49, 615 P.2d 101, 104 (1980). Moreover, because we are remanding for resentencing on the lesser included offense of second degree assault, Maddox's claims regarding the substitution of judges are largely moot. We take judicial notice of the fact that Judge Cooper retired in October 2006. Thus, a judge other than Maddox's trial judge will necessarily be presiding over his resentencing on the second degree assault offense.

Maddox claims that the circuit court erred in denying his motion to continue sentencing and that his sentencing counsel provided ineffective assistance. These claims are primarily based on Maddox's contention that his sentencing counsel did not have adequate time to respond to the State's motion for an extended term of imprisonment and did not effectively oppose the State's motion. Our remanding the case for resentencing on the second degree assault offense renders these claims moot.

 Finally, Maddox argues that his trial counsel was ineffective for failing to file a motion pursuant to Hawaii Rules of Penal Procedure (HRPP) Rule 48 to dismiss the indictment because the trial was not commenced within the time period required by HRPP Rule 48. The State responds with a detailed computation of the countable and excludable time periods under HRPP Rule 48 which it claims demonstrates that the six-month time limit set forth in HRPP Rule 48(b) was not violated. The State argues the because HRPP Rule 48 was not violated, Maddox's counsel had no duty to file a HRPP

Rule 48 motion to dismiss and was not ineffective for failing to do so.

Maddox did not include as part of the record on appeal transcripts of hearings held on the State's motions to continue the trial that were granted by the circuit court. Maddox therefore failed to meet his burden of demonstrating "error by reference to matters in the record." *State v. Hoang*, 93 Hawai'i 333, 334, 3 P.3d 499, 500 (2000). Without the missing transcripts, Maddox cannot show that HRPP Rule 48 had been violated and thus cannot meet his burden of demonstrating that his counsel was ineffective for failing to file a HRPP Rule 48 motion to dismiss. *Id.* (holding that where the record is insufficient to show that the alleged error occurred, "the presumption that the trial court acted without error must prevail"). Accordingly, we reject Maddox's claim that his counsel provided ineffective assistance in failing to file a HRPP Rule 48 motion to dismiss the indictment.

## CONCLUSION

We vacate the portion of the circuit court's September 14, 2005, Judgment that convicted and sentenced Maddox for first degree assault and the portion of the Judgment that imposed restitution and delegated determination of the manner of payment to the Director of the Department of Public Safety. We remand the case with instructions that the circuit court: 1) enter a judgment convicting Maddox of the lesser included offense of second degree assault in violation of HRS § 707–711(1)(a); 2) sentence Maddox on the second degree assault offense; and 3) take other actions consistent with this opinion. We affirm the portion of the circuit court's Judgment that convicted and sentenced Maddox for criminal trespass in the second degree.